## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724 16-MD-2724 HON. CYNTHIA M. RUFE |
| IN RE: PROPRANOLOL CASES | LEAD CASE: 16-PP-27240 END-PAYER CASE: 16-PP-27242 |
| THIS DOCUMENT RELATES TO: | |
| *ALL END-PAYER ACTIONS* | JURY TRIAL DEMANDED |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN; THE CITY OF PROVIDENCE, RHODE ISLAND; HENNEPIN COUNTY; LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; SELF-INSURED SCHOOLS OF CALIFORNIA; SERGEANTS BENEVOLENT ASSOCIATION OF THE POLICE DEPARTMENT OF THE CITY OF NEW YORK HEALTH AND WELFARE FUND and UNITE HERE HEALTH, on behalf of themselves and all others similarly situated, | __CONSOLIDATED AMENDED END-PAYER CLASS ACTION COMPLAINT__ |
| Plaintiffs, | |
| v. | |
| ACTAVIS HOLDCO U.S., INC.; ACTAVIS PHARMA, INC.; BRECKENRIDGE PHARMACEUTICALS, INC.; HERITAGE PHARMACEUTICALS, INC.; MYLAN INC.; MYLAN PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.; TEVA PHARMACEUTICALS USA, INC.; and UPSHER-SMITH LABORATORIES, INC., | |
| Defendants. | |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ................................................................ 1

II.     ONGOING FEDERAL AND STATE INVESTIGATIONS ................................ 5

III.    JURISDICTION AND VENUE ......................................................... 10

IV.     PLAINTIFFS ........................................................................ 11

V.      DEFENDANTS ....................................................................... 19

VI.     CO-CONSPIRATORS ................................................................. 22

VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE ........................... 23

VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY .............................. 23

        A.      Generic Drugs Are Commodity Products ............................... 23

        B.      Pricing in the U.S. Prescription Drug Industry ...................... 27

IX.     THE GENERIC PROPRANOLOL CONSPIRACY ................................... 30

        A.      Congressional Responses to Generic Drug Price Increases ........... 30

        B.      The Generic Propranolol Market ...................................... 31

        C.      Generic Propranolol Price Increases .................................. 32

        D.      Extended Release Capsules ........................................... 34

        E.      Tablets .............................................................. 41

        F.      Defendants' Conspiracy ............................................... 49

        G.      Defendants' Concerted Efforts to Increase Prices for Generic Propranolol
                Yielded Supracompetitive Profits .................................... 69

        H.      Factors Increasing the Market's Susceptibility to Collusion ......... 69

                1.      Industry Concentration ........................................ 70

                2.      Barriers to Entry ............................................. 73

                3.      Demand Inelasticity ........................................... 74

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

4.     Lack of Substitutes ............................................................... 75

5.     Standardized Product with High Degree of Interchangeability ............... 76

6.     Inter-Competitor Contacts and Communications ..................................... 77

X.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .......... 84

    A.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy ........................ 84

    B.     Fraudulent Concealment Tolled the Statutes of Limitations ................................ 87

         1.     Active Concealment of the Conspiracy .................................... 88

         2.     Plaintiffs Exercised Reasonable Diligence ................................ 90

XI.     CONTINUING VIOLATIONS ........................................................ 90

XII.     DEFENDANTS' ANTITRUST VIOLATIONS ................................................. 91

XIII.     CLASS ACTION ALLEGATIONS .................................................... 93

XIV.     CAUSES OF ACTION ................................................................ 98

         FIRST COUNT: Violation of Sections 1 and 3 of the Sherman Act (on behalf of Plaintiffs and the Nationwide Classes) .................................... 98

         SECOND COUNT: Violation of State Antitrust Statutes (on behalf of Plaintiffs and the Damages Class) ....................................................... 100

         THIRD COUNT: Violation of State Consumer Protection Statutes (on behalf of Plaintiffs and the Damages Class) ....................................... 122

         FOURTH COUNT: Unjust Enrichment (on behalf of Plaintiffs and the Damages Class) ................................................................... 158

XV.     PRAYER FOR RELIEF ................................................................ 182

XVI.     JURY DEMAND .......................................................................... 184

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.     <u>NATURE OF THE ACTION</u>

1.      This suit brings claims on behalf of indirect purchasers of generic Propranolol ("End-Payers" or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Propranolol.

2.      Propranolol[1] is used to treat tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions.  It is also used to treat or prevent heart attacks, and to reduce the severity and frequency of migraine headaches. It is reportedly the highest-selling beta-blocker as measured by prescriptions.

3.      For years, competition among sellers of generic Propranolol kept prices stable, at low levels.  But starting in March 2013 (for Propranolol capsules) and December 2014 (for Propranolol tablets), Defendants, who dominate the market for Propranolol, abruptly and inexplicably raised prices.  The price increases were extreme and unprecedented:  prices for generic Propranolol caplets and tablets increased by as much as 350% and 650% respectively. Prices remain at elevated levels today.

4.      Defendants' unlawful and anticompetitive conduct in the Propranolol market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.      The price increases imposed by Defendant manufacturers of generic Propranolol cannot be explained by supply shortages or any other market feature or shock.  Nor were they the

---

[1] Unless specified otherwise, the term "Propranolol" as used herein refers to both Propranolol tablets and extended release (or "ER") capsules, but not any other formulations of Propranolol hydrochloride.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

result of unilateral business decisions.   Instead, the significant increases in the prices of Propranolol were the result of an illegal agreement among Defendants to fix prices.

6.      The market for generic Propranolol was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and is subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.  Because generic Propranolol is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume.  Federal regulations require Defendants' generic Propranolol products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another.   They are therefore interchangeable commodity products. Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

7.      Because purchasers choose whose generic Propranolol product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

8.      Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on generic Propranolol prices and allocate markets and customers for generic Propranolol.  As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association (now the Association for Accessible Medicines) ("GPhA"), the National Association of Chain Drug Stores ("NACDS"), the Healthcare

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Distribution Management Association (now the Healthcare Distribution alliance ) ("HDMA"), and Efficient Collaborative Retail Marketing ("ECRM"), among others.

9.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Propranolol—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

10.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide.  But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates . . . a significant number of the Defendants . . . [and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

11.     The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies.  Way beyond. . . .  We're learning new things every day."[4]  There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and

_____

[2] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[3] Intervenor United States' Motion to Stay Discovery at 1–2 (May 1, 2017), ECF No. 279.

[4] *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, Kaiser Health News (Dec. 21, 2016), *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[5]

12.     Manufacturers of generic Propranolol are implicated in these ongoing investigations; at least five of the Defendants named here, including Actavis Holdco U.S., Inc., Heritage Pharmaceuticals, Inc., Mylan Inc., Par Pharmaceutical, Inc., and Teva Pharmaceuticals USA, Inc., have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.

13.     As End-Payers in the chain of pharmaceutical distribution, Plaintiffs bear the brunt of Defendants' illegal conduct.  Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic Propranolol.

14.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Propranolol products manufactured by any Defendant, other than for resale, from March 2013 to the present (for Propranolol capsules) or December 2014 to the present (for Propranolol tablets) (the "Class Periods"), and (b) a damages class of persons or entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Propranolol products manufactured by any Defendant, other than

---

[5] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for resale, from March 2013 to the present (for Propranolol capsules) or December 2014 to the present (for Propranolol tablets).

## II.   ONGOING FEDERAL AND STATE INVESTIGATIONS

15.     Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit.  On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President).  The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[6]

16.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[7]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[8]  As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.  More criminal charges and guilty pleas are expected to follow.[9]

---

[6] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016), ECF No. 1; Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016), ECF No. 1.

[7] *See* Tr. of Plea Hr'g, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hr'g, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[8] DOJ, Press Release (Dec. 14, 2016), *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[9] *See, e.g.*, Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg*, Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"),

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

17.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.  The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[10]  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[11]

18.     According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.  *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[12]

19.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun

---

*available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

[10] David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be Filed by Year-End*, Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[11] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[12] *Id.*

Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus"). And as recently as August 10, 2017, Pfizer, Inc. ("Pfizer") also disclosed that DOJ is investigating its Greenstone generics business.[13]

20.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant. DOJ does not empanel grand juries lightly. The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[14]

21.    As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the

---

[13] Further discussion of these generic drug manufacturers and their receipt of subpoenas or other inquiries from DOJ is included *infra* at ¶ 191.

[14] DOJ, Antitrust Division Manual III-81–83 (5th ed. 2015), *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[15]

22.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[16]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[17]

23.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price-fixing and customer allocation.[18]  Although the States' present complaint focuses on two drugs (doxycycline hyclate delayed release and glyburide), the States make clear that they have

---

[15] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual*, Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[16] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says,* mLex (Feb. 21, 2017).

[17] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available a*t https://www.justice.gov/atr/page/file/926521/download.

[18] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724 (ECF No. 417).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

"uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[19]

24.    The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[20]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications.    "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[21]

25.    The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg.    The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[22]  Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.  What is known is that in light of all the evidence described above, the large and unprecedented price increases for

---

[19] *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn. Mar. 1, 2017), ECF No.  168 at ¶ 9 (State AG Complaint), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[20] Mark Pazniokus, *How a small-state AG's office plays in the big leagues*, CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.

[21] State AG Complaint ¶ 7.

[22] State AG Complaint ¶ 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Propranolol cannot be explained by normal, competitive market forces.  The explanation is collusion.

26.   A separate action filed by Heritage against Glazer and Malek details a discussion between the two former executives about selling Propranolol at a "high price" in early 2015, which is when the extraordinary price increases for Propranolol tablets—the product which Heritage sells—began.[23]

### III.   JURISDICTION AND VENUE

27.   Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C.  § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

28.   This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

29.   Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26).  In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

30.   Venue is proper in this District pursuant to 15 U.S.C.  §§  15(a) and 22 and 28 U.S.C §§ 1391(b)–(d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Periods, Defendants resided, transacted business, were found, or had

---

[23] *See Heritage Pharm. Inc. v. Jeffrey A. Glazer & Jason T. Malek*, Case No. 16-cv-08483 (D.N.J. Nov. 11, 2016), app. A, n. 95.

agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.   Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here.   According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[24]

31.   This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:   (a) transacted business throughout the United States, including in this District; (b) sold Propranolol throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.   **PLAINTIFFS**

32.   Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York.   District Council 37 (the "Union") is New York City's largest public employee union.   The Union includes 51 local unions, representing public sector employees

---

[24] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

serving in thousands of job titles from Accountants to Zoo Keepers.  Members covered by DC 37's benefit plan work in almost every agency in New York City, including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges.  DC 37 provides supplemental health benefits, including a prescription drug benefit, to approximately 313,000 individuals, including both active members and their families and 50,000 retirees, who reside in numerous locations in the United States. During the Class Periods, DC 37 indirectly purchased and paid for some or all of the purchase price for one or more generic Propranolol capsules prescriptions, and generic Propranolol tablets prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements for generic Propranolol capsules in Arizona, California, Connecticut, Florida, Georgia, Iowa, Kansas, Massachusetts, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina and Texas thereby suffering injury to its business and property.  Plaintiff made such payments and/or reimbursements for generic Propranolol tablets in Alabama, Arizona, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Massachusetts, Nevada, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia, the District of Columbia and Puerto Rico, thereby suffering injury to its business and property.  During the Class Periods, DC 37 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, DC 37 was injured in its business or property by reason of the violations of law alleged herein.  DC 37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

33.     Plaintiff The City of Providence, Rhode Island ("Providence") is a municipal corporation.  Its principal office is located in Providence, Rhode Island.  Providence is a self-insured health and welfare benefit plan, and purchases, pays and/or provides reimbursement for its employees, retirees, and/or plan beneficiaries, who reside in numerous locations in the United States, for some or all of the purchase price of prescription drugs.  During the Class Periods, Providence indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for one or more generic Propranolol capsules prescriptions, and generic Propranolol tablets prescriptions, other than for resale, manufactured by the Defendants. Providence made such payments and/or reimbursements for generic Propranolol capsules in Arizona, Colorado, Connecticut, Florida, Illinois, Massachusetts, New Hampshire, New York, Pennsylvania, Rhode Island and Texas, thereby suffering injury to its business and property. Plaintiff made such payments and/or reimbursements for generic Propranolol tablets in Arizona, Florida, Massachusetts, Pennsylvania and Rhode Island, thereby suffering injury to its business and property.  During the Class Periods, Providence paid and/or reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, Providence was injured in its business or property by reason of the violations of law alleged herein.  Providence intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

34.     Plaintiff Hennepin County is a political subdivision created and authorized under the laws of the State of Minnesota.  It maintains a self-insured health and welfare plan that provides benefits, including prescription-drug benefits to approximately 17,000 plan members.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

During the Class Periods, Hennepin County indirectly purchased and paid for some or all of the purchase price for one or more generic Propranolol capsules prescriptions, and generic Propranolol tablets prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements for generic Propranolol capsules in California, Colorado, Florida, Michigan, Minnesota, Texas, and Wisconsin, thereby suffering injury to its business and property. Plaintiff made such payments and/or reimbursements for generic Propranolol tablets in Arizona, California, Connecticut, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, New York and Wisconsin, thereby suffering injury to its business and property. During the Class Periods, Hennepin County paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, Hennepin County was injured in its business or property by reason of the violations of law alleged herein. Hennepin County intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

35.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is headquartered in Baton Rouge, Louisiana, and is Louisiana's oldest and largest domestic health insurer, with over 1 million members. During the Class Period, BCBS-LA indirectly purchased, paid, and/or provided reimbursement on behalf of its members for some or all of the purchase price for one or more generic Propranolol capsules prescriptions, and generic Propranolol tablets prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements for Propranolol capsules in Alabama, Alaska, Arizona, Arkansas, California,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia and Wyoming, thereby suffering injury to its business and property. Plaintiff made such payments and/or reimbursements for Propranolol tablets in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, the District of Columbia and Puerto Rico, thereby suffering injury to its business and property.  During the Class Periods, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein.  BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

36.    Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("Philadelphia Teacher's Fund") is a voluntary employee benefits plan organized pursuant to section 501(c) of the Internal Revenue Code to provide health benefits to its eligible participants and beneficiaries.  Philadelphia Teacher's Fund maintains its principal place of business in Philadelphia, Pennsylvania.  It provides health benefits, including prescription drug benefits, to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

approximately 34,000 beneficiaries and covered spouses and dependents.  During the Class Periods Philadelphia Teacher's Fund indirectly purchased and paid for some or all of the purchase price for one or more generic Propranolol capsules prescriptions, and generic Propranolol tablets prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements for generic Propranolol capsules in Arizona, California, Colorado, Florida, Indiana, Kansas, Maryland, Missouri, New Jersey, New York and Pennsylvania, thereby suffering injury to its business and property.  Plaintiff made such payments and/or reimbursements for generic Propranolol tablets in California, Delaware, Florida, Georgia, Indiana, Kansas, Nevada, New Jersey and Pennsylvania, thereby suffering injury to its business and property.  During the Class Periods, Philadelphia Teacher's Fund purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, Philadelphia Teacher's Fund was injured in its business or property by reasons of the violations of law alleged herein. Philadelphia Teacher's Fund intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

37.     Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public school district members.  It is headquartered in Bakersfield, California.  It provides health benefit plans to approximately 300,000 members who reside in numerous locations in the United States.  During the Class Periods, SISC indirectly purchased and paid for some or all of the purchase price for one or more generic Propranolol capsules prescriptions, and generic Propranolol tablets prescriptions, other

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

than for resale, manufactured by the Defendants.   SISC made such payments and/or reimbursements for generic Propranolol capsules in Alaska, Arizona, California, Colorado, Florida, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Missouri, Nebraska, Nevada, New Mexico, New York, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, Virginia and Wisconsin, thereby suffering injury to its business and property.   Plaintiff made such payments and/or reimbursements for generic Propranolol tablets in Alabama, Arizona, California, Colorado, Connecticut, Florida, Hawaii, Illinois, Indiana, Kansas, Michigan, Montana, Nevada, New Mexico, New York, Ohio, Oklahoma, Oregon, Tennessee, Texas, Utah, Virginia and Washington, thereby suffering injury to its business and property.   During the Class Periods, SISC paid and reimbursed more for these products more than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.   As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein.   SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

38.     Plaintiff Sergeants Benevolent Association of the Police Department of the City of New York Health and Welfare Fund ("SBA Fund") is a citizen of the State of New York, and has its principal place of business in New York, New York.   SBA Fund is an independent labor organization operating under Internal Revenue Code section 501(c)(5), and is sponsored and administered by a Board of Trustees.   As such, SBA Fund is a legal entity entitled to bring suit in its own name.   SBA Fund is an "employee welfare benefit plan" and an "employee benefit plan" with membership of approximately 36,000 active and retired sergeants of the New York City Police Department and their dependents.   It provides health care benefits, including prescription

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

drug benefits, to participants and their dependents.   During the Class Periods, SBA Fund indirectly purchased and paid for some or all of the purchase price for one or more generic Propranolol capsules prescriptions, and generic Propranolol tablets prescriptions, other than for resale, manufactured by the Defendants.  SBA Fund made such payments and/or reimbursements for generic Propranolol capsules in Arizona, California, Florida, Georgia, Indiana, Kansas, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Vermont and Virginia, thereby suffering injury to its business and property.   Plaintiff made such payments and/or reimbursements for generic Propranolol tablets in Arizona, California, Florida, Georgia, Illinois, Kansas, Maine, Massachusetts, Nevada, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas, Vermont and Virginia, thereby suffering injury to its business and property.  During the Class Periods, SBA Fund paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, SBA Fund was injured in its business or property by reasons of the violations of law alleged herein.  SBA Fund intends to continue paying and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

39.     Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market.  Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Periods, UHH indirectly purchased and paid for some or all of the purchase

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

price for one or more generic Propranolol capsules prescriptions, and generic Propranolol tablets prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements for generic Propranolol capsules in Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Massachusetts, Michigan, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Virginia, and Washington, thereby suffering injury to its business and property.  Plaintiff made such payments and/or reimbursements for generic Propranolol tablets in Arizona, California, Colorado, Connecticut, Florida, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Nevada, New Hampshire, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington, thereby suffering injury to its business and property.  During the Class Periods, UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, UHH was injured in its business or property by reason of the violations of law alleged herein.  UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V.   **DEFENDANTS**

### Actavis Defendants

40.    Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceutical USA, Inc. acquired the Actavis Generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan

Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis generic operations), among others.  Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  Teva Pharmaceutical USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.

41.     Defendant Actavis Pharma, Inc. is Delaware corporation with its principal place of business in Parsippany, New Jersey.  It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.  It manufactures, markets, and/or distributes generic drugs, including Propranolol. Actavis Pharma, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

42.     Unless addressed individually, Actavis Holdco and Actavis Pharma, Inc. are collectively referred to herein as "Actavis."   During the Class Period, Actavis sold generic Propranolol in this District and other locations in the United States.

**Breckenridge**

43.     Defendant Breckenridge Pharmaceuticals, Inc. ("Breckenridge") is a Delaware corporation with its headquarters in Boca Raton, Florida.   During the Class Periods, Breckenridge sold generic Propranolol in this District and other locations in the United States.

**Heritage**

44.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey.  It is the exclusive United States

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

commercial operation for Emcure Pharmaceuticals Private Ltd., an Indian company headquartered in Pune, India.  During the Class Periods, Heritage sold generic Propranolol to customers in this District and other locations in the United States.

**Mylan Defendants**

45.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

46.    Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

47.    Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan."  During the Class Periods, Mylan sold generic Propranolol to customers in this District and other locations in the United States.

**Par**

48.    Defendant Par Pharmaceutical Inc. ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York.  Par is a wholly-owned subsidiary of Endo International plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland.  In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc. and combined it with Endo's existing generics subsidiary, Qualitest Pharmaceuticals ("Qualitest"), naming the segment Par Pharmaceutical, Inc.  Par is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

agent in Pennsylvania.  During the Class Periods, Qualitest sold generic Propranolol to customers in this District and other locations in the United States.  In this complaint, Defendant Par and Qualitest will be referred to collectively as "Par."

**Teva**

49.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.  Teva is registered with the Pennsylvania Department of State as a foreign corporation.  During the Class Periods, Teva sold generic Propranolol to customers in this District and other locations in the United States.

**Upsher-Smith**

50.     Defendant Upsher-Smith Laboratories, LLC ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota.  It is wholly owned by Sawai Pharmaceutical Co., Ltd. ("Sawai"), a large publicly traded generic pharmaceutical company in Japan.  Sawai acquired Upsher-Smith Laboratories, Inc. in June 2017.  During the Class Periods, Upsher-Smith sold generic Propranolol to customers in this District and other locations in the United States.

## VI.     CO-CONSPIRATORS

51.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

52.     During the Class Periods, Defendants sold and distributed generic Propranolol in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

53.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Propranolol, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

54.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Propranolol to Plaintiffs inside each respective state and territory.  The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.   Generic Drugs Are Commodity Products

55.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[25]  "In 2015, generic drug sales in the United States were estimated at $74.5 billion."[26]

---

[25] GPhA, *Generic Drug Savings in the U.S.* at 1 (2015) ("GPhA Report"), *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[26] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

56.    According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[27] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[28]

57.    In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[29] And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[30] Mature generic markets—like that of Propranolol—typically have several manufacturers that compete for sales, hence keeping prices in check.

58.    Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines

---

[27] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G (last visited Aug. 10, 2017).

[28] *Id.*

[29] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* at 8–9 (Sep. 15, 2010), *available at* https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/09-15-prescriptiondrugs.pdf.

[30] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* at 8 (Jan. 2010), *available at* https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[31]

59.    The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585).  The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs.  Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

60.    Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

61.    Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[32]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

---

[31] GPhA Report at 1.

[32] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

62.     It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:



**Generic Competition and Drug Prices**

Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

63.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.  A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base.  Manufacturers also said that as each new manufacturer enters an established generic drug

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[33]

64.     When there are multiple generic manufacturers in an established generic market—as with generic Propranolol—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

### B.     Pricing in the U.S. Prescription Drug Industry

65.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

66.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community

---

[33] GAO, GAO-16-706, Report to Congressional Requesters, Generic Drugs Under Medicare at 23 (Aug. 12, 2016) ("GAO Report"), *available at* http://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmacies to acquire prescription . . . drugs."[34]   "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[35]   In effect, NADAC is "a single national average."[36]  Thus, NADAC is one way to track general price trends in the marketplace.

67.    While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks-like WACs (Wholesale Acquisition Costs)-for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.   The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price.   Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[37]

68.    The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC.  The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.  Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain

---

[34] CMS, *Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs* at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[35] *Id.* at 15.

[36] *Id.*

[37] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry.  And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing.  NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmacies to acquire the drugs.  As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

69.     To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices-Maximum Allowable Costs ("MACs")-that set the amounts they will pay pharmacies for some generic drugs.  A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

70.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug.  So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.  A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

71.     Drug purchasers always should have an incentive to buy the least expensive available drug.  Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## IX.   THE GENERIC PROPRANOLOL CONSPIRACY

### A.   Congressional Responses to Generic Drug Price Increases

72.     In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.  These concerns were prompted by the very real hardship suffered by end-payers as a result of the unprecedented price increases.

73.     In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price increases.  Six of those drugs are now the subject of complaints in this MDL, and five of the defendants in this action—Actavis, Heritage, Mylan, Par, and Teva—received letters from Senator Sanders and Representative Cummings.[38]   In November 2014, Senator Sanders conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing").   Various witnesses discussed the price hikes for generic drugs, but none of the industry executives who were invited to testify—including Erez Vigodman, President and Chief Executive Officer of Defendant Teva Pharmaceutical Industries Ltd.—appeared.[39]

74.     Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and

---

[38] Sen. Sanders, Press Release (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[39] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Medicaid programs.  The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far out-stripped inflation.[40]

75.     In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[41]  The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[42]  And this was the case for most generics.  But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[43]

**B.     The Generic Propranolol Market**

76.     Propranolol is sold throughout the United States and its territories.  The market for generic Propranolol is mature and Defendants that operate in that market can only gain market share by competing on price.

77.     Propranolol was discovered in 1964 and is the generic version of Inderal.  The FDA approved Inderal, developed by Wyeth Pharmaceuticals, Inc., in 1967.  Propranolol is a beta-blocker.  Beta-blockers are medications used by doctors and patients to manage cardiac arrhythmias; they operate by blocking the receptor sites for epinephrine (adrenaline) and norepinephrine (noradrenaline) on adrenergic beta receptors.  Propranolol is used to treat

---

[40] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[41] GAO Report.

[42] *Id.* at 23–25.

[43] *Id.* at 1 & App. III.

tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions. Propranolol is also used to treat or prevent heart attack, and to reduce the severity and frequency of migraine headaches. Propranolol is reportedly the highest-selling beta-blocker as measured by prescriptions.

78.     At all relevant times, Defendants had substantial market power with respect to generic Propranolol. Defendants exercised this power to maintain supracompetitive prices for Propranolol without losing so many sales as to make the elevated price unprofitable.

79.     Defendants sold generic Propranolol at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

80.     During the Class Periods, Defendants dominated the Propranolol market. For Propranolol capsules the combined market share of the Defendants was approximately ▮ in November 2013 (Actavis, ▮; Breckenridge, ▮%, Upsher-Smith, approximately ▮). These ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For Propranolol tablets, the combined market share of the Defendants was approximately ▮% in January 2015 (Actavis, ▮ Heritage, ▮; Mylan, ▮ Teva, ▮; Par, ▮).

81.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Propranolol.

**C.     Generic Propranolol Price Increases**

82.     As the following chart (based on NADAC data) indicates, prices for generic Propranolol capsules—which are sold by Defendants Actavis, Breckenridge, and Upsher-Smith ("Capsule Defendants")—began to rise in approximately March 2013, and thereafter increased significantly. Prices appear to reflect a "one-way ratchet": prices never decreased substantially,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

as one would expect if sudden price increases reflected temporary supply shortages, cost increases, or other benign market factors.



83.     Similarly, as the following chart based on NADAC data indicates, prices for generic Propranolol tablets—which are sold by Defendants Actavis, Heritage, Mylan, Par, and Teva ("Tablet Defendants")—rose significantly, beginning in 2015.  These prices, too, reflected a one-way ratchet, and did not decrease substantially as would be expected if the increases had a benign market explanation.

-33-



### D. **Extended Release Capsules**

84.     Defendants Actavis, Breckenridge, and Upsher-Smith have been the primary sellers of Propranolol capsules and increased their prices by similar amounts at similar times.

85.     For the two and a half years before the capsules conspiracy began, transaction prices for Propranolol capsules were only 57 cents per capsule on average and were at times as low as 44 cents per capsule.  After Defendants agreed to raise and fix prices, the average price doubled, regularly reaching more than $1 per capsule, and often $1.43 per capsule.  The average capsule price charged by certain Defendants reached as high as over $1.70 per capsule, over a 350% increase in price.

86.     Data showing Medicaid reimbursements—the amounts that Medicaid has paid to cover its beneficiaries' prescription drug purchases—provides prices by manufacturer and confirms that Defendants increased their prices for generic Propranolol in very similar fashion over time for both Propranolol capsules and tablets.

87.    The following charts display the per-unit amounts that Medicaid has reimbursed for its beneficiaries' purchases of Defendants' generic Propranolol capsule products:









PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

88.   The following charts, based on National Sales Perspectives ("NSP") data obtained from IMS Health, illustrate the abrupt price shift that occurred in Defendants' effective prices for generic Propranolol capsules[44]:



_____

[44] Plaintiffs calculate Defendants' effective prices based on IMS Health's National Sales Perspectives (NSP) data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]"  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.  Effective prices are calculated to multiple decimals.  For ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



89.   **<u>Breckenridge</u>**

90.   



91.

92.

93.

94.







PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

95. ███████████████████████████████████████████ ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

96. **Actavis**

97. ███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

98. ███████████████████████████████████████████████

█████████████████████████████████████████████████

99. ███████████████████████████████████████████████

█████████████████████████████████████████████████

100. ███████████████████████████████████████████████

██████████████████████████████████████████████████

101. ███████████████████████████████████████████████

███████████████████████████████████████████████████

102. ██████████████████████████████████ ██████████████

███████████████████████████████████████████████████

█████████████████████████

103. **Upsher-Smith**

104. ███████████████████████████████████████████████

███████████████████████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



105.

106.

107.

108.

109.

E.   **Tablets**

110.   Defendants Actavis, Heritage, Mylan, Par, and Teva have been the primary sellers of Propranolol tablets and increased their prices by similar amounts at similar times.

111.   In the four years before the tablets conspiracy began, transaction prices for Propranolol tablets remained under 4 cents per pill on average, sometimes reaching as low as 3 cents per pill on average.  After the conspiracy started, the average price was regularly over 475% higher, reaching 19 cents per pill and even as high as 26 cents per pill, a 650% increase. During the conspiracy period, some Defendants charged almost 30 cents per pill on average across all dosage strengths of their tablet products.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

112.    The following charts display the per-unit amounts that Medicaid has reimbursed

for its beneficiaries' purchases of Defendants' generic Propranolol capsule tablets:



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

113.    The prices for Propranolol tablets had been stable for a substantial period until December 2014.  As alleged below, most of the Tablet Defendants began their price increases in January and February 2015.

114.    ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

115.    ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████

116.    ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████

117.    ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████

118.    There are no legitimate reasons or competitive explanations for Defendants' unprecedented and dramatic price increases for Propranolol capsules and tablets.  Because

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Propranolol is a commodity product, absent a cartel, it would be expected that any manufacturer who raised the price of the drug would lose customers to manufacturers who did not raise prices. As a result, it would not be in any manufacturer's self-interest to raise the price of Propranolol unless an agreement existed with other manufacturers to raise prices.   Moreover, During the Class Periods, the costs of manufacturing Propranolol remained stable, as did supply and demand.  There were no supply shortages or disruptions, new patents or formulations, or changes in the drug labeling that could explain the abrupt, dramatic, and uniform price hike.  And yet, each Defendant raised the prices of Propranolol by extraordinary margins.  Absent the existence of a cartel, such price increases would not have been in each Defendant's self-interest

119.    There were no reported shortages of Propranolol capsules that could account for Defendants' price increases.

120.    Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage.  No supply disruption was reported to the FDA by Defendants with respect to Propranolol during the Class Periods.

121.    Reports on the American Society of Health-System Pharmacists ("ASHP") Drug Shortage website about Propranolol tablet availability during the latter part of the Propranolol Tablets Class Period are contradicted by IMS manufacturer units sales data, but even if the reports were validated, none supports Tablet Defendants' early 2015 price increases:

(a)    Par (Qualitest) provided no notices of shortages.

(b)    Mylan did not report shortages (or back orders) until October 2015 through March of 2016. Despite reports, Mylan's sales volume actually increased several fold in 2015 and 2016 in comparison to 2014.

(c)     Teva "could not provide a reason for the shortage[s]" it reported of certain counts of its tablets beginning in July 2015 and through September of 2016.  Despite the reports, Teva (now Impax) also increased its sales volume over the Propranolol Tablets Class Period.

(d)     ASHP reported in July and October 2015 that Actavis had a shortage only of its 80 mg, 500 count tablets and like Teva, it could not "provide a reason for the shortage." Despite the report, Actavis actually sold more units of 80 mg tablets in 2015 than in 2014.

(e)     In July 2015 Heritage reported a shortage across all dosages, citing "a raw materials issue" which no other manufacturers reported.   And in December 2015 through September 2016, ASHP reported that Heritage was not marketing Propranolol tablets at that time. Despite "not marketing tablets" at this time, IMS unit sales data shows that ████████

████████████████████████████████████████████████████████████

████████████████████████████████

### F.     **Defendants' Conspiracy**[45]

122.     Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.   These dramatic price increases were the product of an illicit understanding among Defendants, which was furthered by discussions held at meetings and industry events hosted by the GPhA, HDMA, MMCAP, NACDS,  HCSCA, and ECRM, as well as other meetings and communications

123.     In order to be successful, collusive agreements require a level of trust among the conspirators.  While this can be accomplished by one-on-one communications, collaboration is

---

[45] The allegations included in this section pertaining to the HDMA, NACDS, MMCAP, and ECRM are based in part upon documents produced to plaintiffs pursuant to *subpoenas duces tecum* issued in *In re Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

124.    Defendants' price increases began shortly after the Defendants attended meetings of the Generic Pharmaceutical Association ("GPhA")[46] and ███████ in February 2013 (for capsules) and after a National Association of Chain Drug Stores ("NACDS") meeting in December 2014 (for tablets).  At these and similar meetings, as set forth below, senior executives of each Defendant reached agreement and monitored compliance.

125.    Defendants and their senior executives are active members of the GPhA.  GPhA calls itself the "leading trade association for manufacturers and distributors of generic prescription drugs."[47]   GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.   GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[48] GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

---

[46] GPhA was recently renamed the Association for Accessible Medicines, but is referred to GPhA throughout.

[47] GPhA, The Association, *available at* http://web.archive.org/web/20150413013801/http://www.gphaonline.org:80/about/the-gpha-association.

[48] GPhA, Membership, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership/.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

126.    A number of Defendants' high-ranking corporate officers served on GPhA's Board of Directors before and during the Class Periods:

(a)    **2012 Board of Directors**: Tony Mauro, President of Mylan North America; Debra Barrett, Sr. VP of Government and Public Affairs for Teva; Doug Boothe, President and CEO of Actavis; and Jeffrey Glazer, CEO of Heritage.

(b)    **2013 Board of Directors**: Tony Mauro, President of Mylan North America; Debra Barrett, Sr. VP of Global Government Affairs and Public Policy for Teva; Jeffrey Glazer, President and CEO of Heritage; and Charlie Mayr, Chief Communications Officer at Actavis.

(c)    **2014 Board of Directors**:  Jeffrey Glazer, CEO of Heritage; Tony Mauro, President of Mylan North America; and Allan Oberman, President and CEO of Teva Americas Generics.

(d)    **2015 Board of Directors**: Debra Barrett, Sr. VP Global Government Affairs for Teva; Jeff Glazer, CEO of Heritage; Marcie McClintic Coates, VP & Head of Global Regulatory Affairs for Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals.

(e)    **2016 Board of Directors**: Debra Barrett, Sr. VP Global Government Affairs for Teva; Heather Bresch, CEO of Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals.

127.    The Capsule Defendants all attended either or both of the October 1–3 2012 Technical Conference in Bethesda Maryland and the February 20–22, 2013 Annual meeting in Orlando Florida.  The Tablet Defendants (and/or their corporate parents) attended the 2015 GPhA Annual Meeting in Miami, Florida between February 9 and 11, 2015.  These meetings

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

provided additional "networking events," which presented opportunities for collusion through informal, off-premises events, such as golf tournaments, fly-fishing outings, and kayaking trips.

128.    Defendants also had opportunities to collude through their involvement in the NACDS.  According to its website, the NACDS is a trade organization whose mission "is to advance the interests and objectives of the chain community pharmacy industry by fostering its growth and promoting its role as a provider of healthcare services and consumer products."[49] Membership in the NACDS is open to generic pharmaceutical manufacturers, and Defendants Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith were NACDS members from 2013 through 2016.  Members have access to custom industry research and industry publications, can participate in NACDS committees and workgroups, and attend various conferences.

129.    On April 20–23, 2013, NACDS held its Annual Meeting in Palm Beach, Florida. NACDS describes the Annual Meeting as "the industry's most prestigious gathering of its most influential leaders," and a "classic 'Top-to-Top' business conference" attended by "senior management" in the pharmaceutical retailing and manufacturing industries.[50]  Attendees are provided a list of participating companies in advance, and have access to private meeting rooms where executives can meet face-to-face.  And attendees can choose from a variety of business programs, "invitation only" events, and social functions.   The following of Defendants' representatives, among others, attended NACDS's 2013 Annual Meeting:

(a)    **Defendant Actavis:** Paul Bisaro, Board Member; Andrew Boyer, President and CEO of North America Generics; Michael Reed, Executive Director of Trade

---

[49] NACDS, *Mission*, *available at* https://www.nacds.org/about/mission/ (last visited July 28, 2017).

[50] NACDS, *Annual Meeting Guide to Success* at 2, *available at*, http://annual.nacds.org/Portals/1/PDFs/an_guide.pdf?ver=2017-07-06-174724-057 (last visited July 28, 2017).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Relations; Michael Baker, Executive VP of Trade Sales and Development; Paul Reed, Sr. Director of Trade Sales and Development; and Robert Stewart, Chief Operating Officer;

(b)     **Defendant Mylan:** Joe Duda, President; Tony Mauro, Chief Commercial Officer; Robert Potter, Sr. VP of North America National Accounts and Channel Development; Jeffrey May, VP of North America Product Strategy; and Jim Nesta, VP of Sales;

(c)     **Defendant Par:** Paul Campanelli, President; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; and Renee Kenney, Sr. Advisor for Generic Sales;

(d)     **Defendant Teva:** Jeremy Levin, President and CEO; Allan Oberman, President and CEO of Teva Americas Generics; Maureen Cavanaugh, Sr. VP and Chief Operating Officer of North America Generics; Teri Coward, Sr. Director Sales and Trade Relations; Michael Sine, Director, Corporate Account Group; Jonathan Kafer, Executive VP, Sales and Marketing; David Marshall, VP of Operations; Dave Rekenthaler, VP of Sales; and

(e)     **Defendant Upsher-Smith:** Mark Evenstad, CEO; Thomas Burke, Chief Operating Officer; Brad Leonard, Sr. Director of National Accounts; Scott Hussey, Sr. VP of Sales; Jim Maahs, VP of Commercial Portfolio Management; and Mike McBride, VP of Partner Relations.

130.     The next year, executives, senior management, and salespeople from Defendants Actavis, Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith attended the NACDS 2014 Annual Meeting held on April 26–29 at The Phoenician resort in Scottsdale, Arizona. This meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)     **Defendant Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts);

(b)     **Defendant Breckenridge**: Larry Lapila, President; Brian Guy, Vice President, Business Development; Martin Schatz, Senior Vice President, Sales;

(c)     **Defendant Heritage**: Glazer (then CEO and Chairman);

(d)     **Defendant Mylan**: Joe Duda, President; Tony Mauro, President; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Rob O'Neill, Head of Sales;

(e)     **Defendant Par**: Jon Holden, Vice President of Sales; Paul Campanelli, President; Renee Kenney, Senior Advisor Generic Sales;

(f)     **Defendant Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Allan Oberman, President and CEO Teva Americas Generics; and,

(g)     **Defendant Upsher-Smith**: Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Jim Maahs, Vice President, Commercial Portfolio Management; Mark Evenstad, CEO; Rusty Field, President.

131.    Executives, senior management, and salespeople from Defendants Actavis, Breckenridge, Mylan, Par, Teva, and Upsher-Smith also attended the NACDS 2015 Annual Meeting held on April 25-28 at The Breakers resort in Palm Beach, Florida.

132.    On August 10–13, 2013, the NACDS held its Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  The Total Store Expo provides pharmaceutical industry executives with opportunities to meet with each other and to "[f]ollow up on key

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

discussions that were initiated during the NACDS Annual Meeting."[51]   The following of Defendants' representatives, among others, attended the NACDS's 2013 Total Store Expo:

       (a)     **Defendant Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts);

       (b)     **Defendant Breckenridge**: Larry Lapila, President;

       (c)     **Defendant Upsher-Smith**: Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Michael Muzetras, Sr. National Accounts Manager; Beth Pannier, Senior National Accounts Manager; Mary Rotunno, National Accounts Manager;

       (d)     **Defendant Heritage**: Matthew Edelson, Senior Director of Sales; Jeffrey A. Glazer (then CEO and Chairman), Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President), Gina Gramuglia, Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts;

       (e)     **Defendant Mylan**: Mike Aigner, Director National Accounts; Kevin McElfresh, Executive Director National Accounts; Joe Duda, President; Robert Potter, Senior Vice President North America National Accounts; Rob O'Neill, Head of Sales; Lance Wyatt, Director National Accounts;

       (f)     **Defendant Par**: Jon Holden, Vice President of Sales; Renee Kenney, Senior Advisor Generic Sales; Karen O'Connor, Vice President National Accounts; Lori Minnihan, Manager, Pricing & Analytics; Warren Pefley, Director, National Accounts; Charles

---

[51] NACDS Total Store Expo, *Why Attend*, *available at* http://tse.nacds.org/attend/why-attend (last visited July 28, 2017).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

"Trey" Propst, Vice President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager; and,

> (g)     **Defendant Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Allan Oberman, President and CEO Teva Americas Generics.

133.    Executives, senior management, and salespeople from Defendants Actavis, Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith attended the NACDS Total Store Expo on August 23–26, 2014, at the Boston Convention Center in Massachusetts, as well as the Total Store Expo on August 22–25, 2015 at the Colorado Convention Center in Denver.

134.    On December 3, 2013, NACDS held its 2013 NYC Week and annual foundation dinner in New York City, which was attended by the following representatives from Defendants:

> (a)     **Defendant Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts);

> (b)     **Defendant Mylan**: Joe Duda, President; Tony Mauro, COO; Robert Potter, Senior Vice President North America National Accounts; Rob O'Neill, Head of Sales;

> (c)     **Defendant Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; and,

> (d)     **Defendant Upsher-Smith**: Scott Hussey, Senior Vice President, Sales; Jim Maahs, Vice President, Commercial Portfolio Management; Mike McBride, Vice President Partner Relations.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

135.    At the August 23–26, 2014 NACDS Total Store Expo at the Boston Convention Center, the following representatives from Defendants, key executives for generic drug pricing and sales, attended:

(a)    **Defendant Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts); Richard Rogerson, Executive Director (Pricing & Business Analytics);

(b)    **Defendant Breckenridge**: Larry Lapila, President; Martin Schatz, Senior Vice President, Sales;

(c)    **Defendant Heritage**: Heather Beem, National Account Manager, Institutional; Katie Brodowski, Associate Director Institutional Sales; Matthew Edelson, Senior Director of Sales; Jeffrey A. Glazer (then CEO and Chairman), Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President); Gina Gramuglia, Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts;

(d)    **Defendant Mylan**: Joe Duda, President Mylan Pharmaceuticals; Robert Potter, Senior Vice President North America National Accounts and Channel Manager;

(e)    **Defendant Par**: Jon Holden, Vice President of Sales; Renee Kenney, Senior Advisor Generic Sales; Lori Minnihan, Manager, Pricing & Analytics; Warren Pefley, Director, National Accounts; Charles "Trey" Propst, Vice President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager;

(f)    **Defendant Teva**: David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Kevin Galowina,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Nisha Patel, Director of National Accounts; and,

(g)    **Defendant Upsher-Smith**: Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Jim Maahs, Vice President, Commercial Portfolio Management.

136.    On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner in New York City, which was attended by the following representatives from Actavis, Mylan, and Teva:

(a)    **Defendant Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts); Brent Saunders, President, CEO and Chairman;

(b)    **Defendant Mylan**: Mike Aigner, Director National Accounts; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Tony Mauro, COO; and,

(c)    **Defendant Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Jessica Peters, Director National Accounts.

137.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

138.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

██████████████████████████████████████

████████████████████

141.  ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

a.  ██████████████████████████████████████

██████████████████████

b.  ██ ███████ ███████ ██████ ███████ ██████ █████ ██████ ████

█████████████████████████████████████

█████████████████████████████████████

█████

c.  ████████████████ ██████ ████ ███████████ ████ ████

█████████████████████████████████████

█████████████████████████████████████

█████████████

d.  ██████████████████████████████████████

██████████████████████████████████████

████████████████████████

e.  ██████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

142.     The HCSCA is a trade association that represents group purchasing organizations, such as the MMCAP.  The HCSCA hosts events that Defendants attend, at which they have the opportunity to interact with each other and discuss their respective businesses and customers.

143.     The HCSCA also hosted the National Pharmacy Forum on February 16–18, 2015, in Tampa, Florida, where the following representatives of Defendants were present:

(a)     **Actavis:** John Fallon, Executive Director of Sales;

(b)     **Breckenridge:** David Giering, Marketing and Trade Relations Manager;

(c)     **Mylan:** Lee Rosencrance, District Manager; Martin Wingerter, Director of National Accounts; Jan Bell, Director of National Accounts; Heather Paton, VP of Institutional Sales; and Mark Pittenger, Sr. Director of National Accounts; and,

(d)     **Teva:** Nick Gerebi, Director of National Accounts; Jeff McClard, Sr. Director of National Accounts; Cam Bivens, Director of National Accounts; and Brad Bradford, Director of National Accounts.

144.     At the National Pharmacy Forum, speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "upcoming patent cliffs" and "market trends."[53]

145.     In 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: (a) ███████████████████████████████████

████████████████████████████████████████████████████████████

---

[53] Healthcare Supply Chain Assoc., *Final Program – 2015 National Pharmacy Forum*, *available at* http://c.ymcdn.com/sites/www.supplychainassociation.org/resource/resmgr/Forum_2015/2015_Pharmacy_Forum_Final_Pr.pdf (last visited July 28, 2017).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

█████████████ (b) the April 11–14, 2016 MMCAP National Member Conference in Bloomington, Minnesota at the Minneapolis Airport Marriott and (c) the August 19-22, 2016, NACDS 2016 Total Store Expo at the San Diego Convention Center in San Diego, California.

146.    In addition to the above, Defendants are involved in an array of buyer-side industry groups, through which they can share pricing strategies, bid terms, and other competitively sensitive information.  For instance, the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") is a group purchasing organization operated and managed by the State of Minnesota's Department of Administration.   According to its website, "MMCAP member facilities purchase over $1 billion per year and have national account status with all of the major brand name and generic pharmaceutical manufacturers."[54]   Several of the Defendants are vendors for the MMCAP.

147.    In 2014, the following Defendant representatives served as vendors for the MMCAP: Mark Blitman, Executive Director of Sales for Government Markets for Actavis; Scott Cohon, National Director of Sales for Breckenridge; Anne Sather, National Account Manager for Heritage; Jan Bell, Director of National Accounts for Mylan; Nick Gerebi, Director of National Accounts for Teva; and Michelle Brassington, Regional Account Manager for Upsher-Smith. Defendants have a continuing relationship with the MMCAP, and several of these individuals served as vendors again in 2016.

148.    On May 12–15, 2014, MMCAP held its National Member Conference in Bloomington, Minnesota.  MMCAP's 2014 National Member Conference was attended by the

---

[54] Mont. State Univ. *Healthcare/ Pharmaceutical Products & Services – Buying at MSU*, *available at* http://www.montana.edu/buyingatmsu/supplies/HealthcareSupplies.html (last visited July 28, 2017).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)     **Defendant Breckenridge**:  Scott Cohon, National Accounts Director;

(b)     **Defendant Mylan**: Jan Bell, Director, National Accounts;

(c)     **Defendant Teva**: Nick Gerebi, National Account Manager;

(d)     **Defendant Upsher-Smith**: Michelle Brassington, Regional Account Manager;

(e)     **Defendant Actavis**: Mark Blitman, Executive Director of Sales for Government Markets; and,

(f)     **Defendant Heritage**: Anne Sather, Director, National Accounts.

149.    The Health Care Supply Chain Association is a trade association that represents group purchasing organizations, such as the MMCAP.  The Health Care Supply Chain Association hosts events that Defendants attend, at which they have the opportunity to interact with each other and discuss their respective businesses and customers.  For example, executives from both Actavis and Teva participated in the LogiPharma Supply Chain Conference on September 16-18, 2014 in Princeton, New Jersey.

150.    The Health Care Supply Chain Association also hosted the National Pharmacy Forum on February 16–18, 2015, in Tampa, Florida, where the following representatives of Defendants were present:

(a)     **Defendant Actavis:** John Fallon, Executive Director of Sales;

(b)     **Defendant Breckenridge:** David Giering, Marketing and Trade Relations Manager;

(c)     **Defendant Mylan:** Lee Rosencrance, District Manager; Martin Wingerter, Director of National Accounts; Jan Bell, Director of National Accounts;; and Mark Pittenger, Sr. Director of National Accounts; and,

(d)     **Defendant Teva:** Nick Gerebi, Director of National Accounts; Jeff McClard, Sr. Director of National Accounts; Cam Bivens, Director of National Accounts; and Brad Bradford, Director of National Accounts.

151.    At the National Pharmacy Forum, speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "upcoming patent cliffs" and "market trends."[55]

152.    In addition to providing an opportunity to share information about the generic pharmaceutical business, these trade association events often include social activities such as theater performances, cocktail parties, and dinners, which allow Defendants' executives to interact with their competitors privately and outside the traditional business setting.

153.    As a result of their involvement in trade associations such as the GPhA, NACDS, MMCAP, and Health Care Supply Chain Association, Defendants had ample opportunities to communicate and agree to raise the price of Propranolol.

154.    As part of its years-long investigation into anticompetitive pricing activities among generic drug manufacturers, DOJ is investigating trade associations like the GPhA for creating opportunities for collusion among different generic manufacturers.  The DOJ has stated

---

[55] Healthcare Supply Chain Assoc., *Final Program – 2015 National Pharmacy Forum*, *available at* http://c.ymcdn.com/sites/www.supplychainassociation.org/resource/resmgr/Forum_2015/2015_Pharmacy_Forum_Final_Pr.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

that trade associations are "one potential avenue for facilitating the collusion between salespeople at different generic producers."[56]

155.    The states attorneys general allegations likewise explain that trade shows "provide generic drug manufacturers . . . with ample opportunity to meet, discuss, devise, and implement a host of anticompetitive schemes that unreasonably restrain competition[.]"[57]  The substantial increases in the prices of generic Propranolol capsules and tablets began within a few weeks of the February 2013 and February 2015 Annual Meetings.

156.    The State AGs allege that Mylan and other generic drug companies used industry trade shows and customer conferences to collude, including conferences hosted by the NACDS, Healthcare Distributions Management Association ("HDMA," now known as the Healthcare Distribution Alliance), and Efficient Collaborative Retail Marketing ("ECRM"), among others. The States further allege: "At these various conferences and trade shows, sales representatives from many generic drug manufacturers . . . have opportunities to interact with each other and discuss their respective business and customers.  Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting.  Of particular importance here, generic drug manufacturer representatives who attend these functions, . . . use these opportunities to

---

[56] FiercePharma, *DOJ criminal probe takes a look at trade associations*, *available at* http://www.fiercepharma.com/regulatory/doj-criminal-probe-takes-a-look-at-trade-associations.

[57] State AG Complaint ¶ 52.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information."[58]

157.    In fact, on June 1–4, 2014, the HDMA held a Business and Leadership Conference ("BLC"), which purports to be the healthcare distribution industry's signature annual conference, at the JW Marriott Desert Ridge in Phoenix, Arizona.  The BLC is exclusive to HDMA member companies, and it brings together high-level executives, thought leaders, and influential managers from across the healthcare supply chain to hold strategic business discussions.  These meetings provided Defendants opportunities to collude in "one-on-one" meeting areas.  The June 1-4, 2014 BLC was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)    **Defendant Upsher-Smith**: Scott Hussey, Senior Vice President, Sales; Jim Maahs, Vice President, Commercial Portfolio Management;

(b)    **Defendant Actavis**: Anthony Giannone, Executive Director, Sales; and,

(c)    **Defendant Mylan**: Richard Issac, Senior Manager, Strategic Accounts; Lance Wyatt, Director, National Accounts.

158.    The June 7–10, 2015 BLC was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)    **Defendant Heritage**: Jeffrey A. Glazer (then CEO and Chairman); Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President); Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts; Matthew Edelson, Associate Director, National Accounts;

---

[58] *Id.* ¶ 51.

(b)      **Defendant Actavis**: Andrew Boyer, Senior Vice President, Generic Sales and Marketing; Marc Falkin, Vice President (Marketing, Pricing and Contracts); Richard Rogerson, Executive Director (Pricing & Business Analytics);

(c)      **Defendant Teva**: Theresa Coward, Senior Director of Sales; Nick Gerebi, Director National Accounts; Nisha Patel, Director of National Accounts; Jessica Peters, Director, National Accounts;

(d)      **Defendant Mylan**: Todd Bebout, Vice President - NA Supply Chain Management; Janet Bell, Director, National Accounts; Richard Isaac, Senior Manager, Strategic Accounts; Stephen Krinke, National Account Manager; Robert O'Neill, Head of Sales Generic, NA, Sean Reilly, National Account Manager; John Shane, Trade Relations; Erik Williams, VP NA Pricing & Contracts; Lance Wyatt, Director, National Accounts;

(e)      **Defendant Par**: Sandra Bayer, Senior National Account Executive; Warren Pefley, Director, National Accounts; Charles "Trey" Propst, Vice President, National Accounts; Michael Reiney;

(f)      **Defendant Breckenridge**: Scott Cohon, National Accounts Director; Philip Goldstein, Director of National Accounts; and,

(g)      **Defendant Upsher-Smith**:   JoAnn Gaio, Senior National Account Manager, Trade; Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts.

159.    In 2016, Defendants also met regularly and attended trade association meetings, conferences, and events, including (a) the April 11–14, 2016 MMCAP National Member Conference in Bloomington, Minnesota at the Minneapolis Airport Marriott and (b) the August

19-22, 2016, NACDS 2016 Total Store Expo at the San Diego Convention Center in San Diego, California.

160.   The State AGs also allege that sales representatives of generic drug manufacturers "get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business."[59]  "In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as 'industry dinners.'"[60]  "At these industry dinners, one company is usually responsible for paying the dinner for all of the attendees.  The company that pays the bill is generally determined by alphabetical order."[61]   Additionally, a large number of generic drug manufacturers, including several Defendants, are headquartered in close proximity to one another in New Jersey, eastern Pennsylvania, or New York, giving them easier and more frequent opportunities to meet and collude.

161.   As a result of these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

162.   Defendants routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the

---

[59] *Id.* ¶ 53.

[60] *Id.* ¶ 55.

[61] *Id.* ¶ 56.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

163.    Defendants also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection and rebates.  Generic drug manufacturers use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

### G.    Defendants' Concerted Efforts to Increase Prices for Generic Propranolol Yielded Supracompetitive Profits

164.    As demonstrated in the charts above, Defendants' agreement led to skyrocketing prices for Propranolol.   These price increases were not the product of unilateral business decisions, but resulted instead from agreements to fix prices.

165.    The enormous price hikes were not accompanied by a significant change in costs to manufacturers.   Thus, the increased prices resulted in an enormous increase in profits to Defendants.

166.    For example, on October 30, 2015, John Sheehan, Mylan's CFO, stated in an earnings call:

> With respect to gross margin, I guess I would start by pointing out that since 2010 our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year of 55%.  So the gross margins have been sustained. They have steadily increased over the last five, six years. . . .  It also has been driven by the positive pricing environment that we've seen, especially over the last couple of years in North America.

### H.    Factors Increasing the Market's Susceptibility to Collusion

167.    Publicly available data on the generic Propranolol market in the United States demonstrate that it is susceptible to cartelization by Defendants.  Factors that make a market

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

## 1.     <u>Industry Concentration</u>

168.  The market for both formulations of Propranolol is highly concentrated. In particular, for Propranolol capsules the combined market share of the Defendants was approximately ▮▮▮ in November 2013 (Actavis, ▮▮▮ Breckenridge, ▮▮▮ Upsher-Smith, approximately▮▮▮). For Propranolol tablets, the combined market share of the Defendants was approximately ▮▮▮ in January 2015 (Actavis, ▮▮▮ Heritage, ▮▮▮; Mylan, ▮▮▮; Teva, ▮▮▮ Par,▮▮).

169.  For example, the market share among the Capsule Defendants remained stable from the beginning of the Propranolol Capsule Class Period through November 2016 for all four dosages: [charts to be redacted]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



170.    While the market for Propranolol is sufficiently concentrated to facilitate

collusion, the years of low and stable pricing in the market establish that the number of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

manufacturers in the market was sufficient to drive competition.  Absent collusion, prices would have remained at competitive levels.

171.    No departures from the market by manufacturers of Propranolol can explain the price increases.

172.    Defendants have been able to maintain supracompetitive prices for Propranolol without significant loss of market share to non-conspirators.  Thus, Defendants have oligopolistic market power in the market for Propranolol.

173.    The magnitude of Defendants' price increases for Propranolol distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase.[62]  But here the increases are extreme – jumping as much as 650% in one fell swoop. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

## 2.    Barriers to Entry

174.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available.  However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

---

[62] Louis Kaplow, Competition Policy and Price Fixing 262 (2013) (discussing why, in the absence of cost or supply shocks, oligopolists resist "sudden and sharp" price increases, and noting, among other things, that "oligopolsits may increase prices in smaller steps because they do not fully trust each other").  *See also* Richard Posner, Antitrust Law 59 (2d ed. 2001) (discussing the various challenges faced by oligopolists when attempting to increase price and why rational economic behavior undermines the ability to effect large and parallel price increases).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

175.     There are significant capital, regulatory, and intellectual property barriers to entry in the generic Propranolol markets that make such entry time-consuming and expensive.

176.     Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Propranolol markets.

177.     In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time.  As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[63]  This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

## 3.     Demand Inelasticity

178.     Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.  It is a measure of how demand for a product reacts to a change in price.  The basic necessities of life— food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life.  In other words, a person on the verge of dying of thirst will pay almost anything for water.

179.     In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in

---

[63] Sen. Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

180.    Demand for generic Propranolol is highly inelastic.  Propranolol is an important and medically necessary drug for millions of people.  Left untreated, certain heart and circulatory conditions normally treated by Propranolol can rapidly worsen and result in hospitalization, acute pain and discomfort, or death.  Therefore, physicians and their patients regard Propranolol as a medical necessity that must be purchased without regard to an increase in price.  While other beta-blockers on the market seek to treat similar conditions, Propranolol is often the only effective medicine that is reasonably available or medically suitable to patients.  When doctors prescribe generic Propranolol, patients therefore view it as necessary to their well-being.  This gives Defendants significant pricing power, as well as an incentive to collude.

181.    Thus, generic Propranolol is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.    Lack of Substitutes

182.    Propranolol is also differentiated from other drug products because of its regulatory status.  A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to—the brand name version and other generic versions of that drug.  Defendants' Propranolol products are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar drug products.  A patient prescribed Propranolol could not, therefore, purchase a different drug using his or her Propranolol prescription, regardless of the respective

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices of the drugs.  The next-best substitute for generic Propranolol is branded Propranolol, which costs significantly more than generic alternatives.

183.    In addition, branded versions of Propranolol do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over even their supra-competitively priced generic counterparts, making them inapt substitutes even when generic prices soar.

184.    Thus, purchasers of generic Propranolol are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized Product with High Degree of Interchangeability

185.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

186.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price.  When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

187.    Defendants' generic Propranolol products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

188.    Moreover, because generic Propranolol products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service. Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.  The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[64]  The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.    Inter-Competitor Contacts and Communications

189.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events.  Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings.  As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[65]

190.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events.  For example, Heritage's Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during

---

[64] *See, e.g.*, GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[65] PaRR Report.

-77-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

191.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[66]  The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

(a)    **Actavis**: In February 2016, Actavis's predecessor, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[67]

(b)    **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[68]  The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[69]

---

[66] State AG Complaint ¶ 7.

[67] Allergan, SEC 2015 Form 10-K at F-106 (Feb. 26, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[68] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit*, Reuters (Dec. 15, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)      **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products."  The Connecticut AG requested that Citron produce all documents produced to DOJ.[70]

(d)      **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[71]

(e)      **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ,[72] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[73]

---

[69] Aurobindo, BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[70] Aceto, SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[71] Dr. Reddy's, SEC Form 6-K at 57 (Dec. 31, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[72] Tom Schoenberg, David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas*, Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[73] *See supra* ¶ 22.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(f)   **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[74]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[75]  In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications.  In particular . . . digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[76]

(g)   **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[77]  On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."  The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any

---

[74] Impax, SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[75] Impax, SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm

[76] Impax, SEC 2015 Form 10-K at 53 (Feb. 22, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm

[77] Lannett, Press Release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

particular product and is not limited to any particular time period."[78]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[79]

(h)   **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena . . . seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[80]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products.  The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[81]

(i)   **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to . . . certain of the Company's generic

---

[78] Lannett, SEC Form 10-Q at 16 (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm

[79] Lannett, SEC Form 10-K at 18 (Aug. 27, 2015), available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[80] Mayne, 2016 Annual Report at 75 (Aug. 25, 2016), *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[81] Mayne, *Update on DOJ Investigation* (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

products (including Doxycycline) and communications with competitors about such products."[82]
On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management,
received subpoenas from DOJ seeking additional information relating to the marketing, pricing
and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products"
and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[83]

(j)     **Par**:  In March 2015, Par disclosed that it received subpoenas from the
Connecticut AG and DOJ relating to digoxin and doxycycline.[84]  In November 2015, Endo
International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par,
received a Subpoena to Testify Before Grand Jury from the Antitrust Division of DOJ and issued
by the U.S. District Court for the Eastern District of Pennsylvania.  The subpoena requests
documents and information focused primarily on product and pricing information relating to
Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline
products, and on communications with competitors and others regarding those products.  Par is
currently cooperating fully with the investigation."[85]  Endo also disclosed that in December 2015
it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of
Attorney General requesting information regarding pricing of certain of its generic products,

---

[82] Mylan, SEC 2015 Form 10-K at 160 (Feb. 16, 2016), *available at*
https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdo
c.htm.

[83] Mylan, SEC Form 10-Q at 58 (Nov. 9, 2016), *available at*
https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdo
c.htm

[84] Par, SEC 2014 Form 10-K at 37 (Mar. 12, 2015), *available at*
https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm

[85] Endo, SEC Form 10-Q at 30 (March 31, 2016), *available at*
https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-
3312016x10q.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[86]

(k)    **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[87]

(l)    **Pfizer:**    On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[88]

(m)    **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[89]

(n)    **Sun**: On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents . . . relating to corporate and employee records, generic

---

[86] *Id.* at 31.

[87] Perrigo, Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[88] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

[89] Novartis, 2016 Financial Report at 217 (Jan. 24, 2017), *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[90]

(o)   **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[91]

(p)   **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[92]

(q)   **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[93]

## X.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

192.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' and other generic drug manufacturers' disclosures of the existence of the

---

[90] Sun, BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[91] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[92] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm

[93] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

government investigations and subpoenas.  Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Propranolol.

193.    In the case of Heritage, specifically, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against this Defendant, until (at the earliest) the filing of the AG's Complaint and/or the filing of the criminal Informations against Glazer and Malek.

194.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Propranolol.

195.    Plaintiffs are purchasers who indirectly purchased generic Propranolol manufactured by one or more Defendants.  They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

196.    Defendants repeatedly and expressly stated throughout the Class Periods, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

(a)      Allergan's (predecessor to Actavis) Code of Conduct provides: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[94]

---

[94] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)     Esteve Group's (parent of Breckenridge Pharmaceutical) Code of Ethics provides: "At ESTEVE we are committed to complying with the applicable legislation defending competition where we carry out our activities to preserve and protect a free, open market, avoiding behaviour that is abusive or restricts competition." The policy directs employees: "Do not exchange sensitive information with competitors or start conversations that may involve anti-competitive behavior. Do not reach agreements with competitors that involve, among other forbidden practices, price fixing or allotting markets or clients. Request advice from the Legal Department should you require answers to any dubious behavior."[95]

(c)     Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[96]

(d)     Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[97]

(e)     Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject

---

[95] Esteve Group Code of Ethics, *available at* http://archivosweb.esteve.com/rsc/en/ethical-code.pdf.

[96] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf.

[97] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."[98]

(f)    Upsher-Smith's Code of Conduct provides: "Upsher-Smith is committed to fair and open competition. Employees of Upsher-Smith are expected to conduct business in compliance with all applicable laws regulating competition and must not knowingly engage in any anti-competitive activity."[99]

197.    It was reasonable for members of the Classes to believe that Defendants were complying with their own antitrust policies.

198.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.    Fraudulent Concealment Tolled the Statutes of Limitations**

199.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas.  Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Propranolol.

---

[98] Teva Code of Conduct, *available at* http://www.tevapharm.com/files/about/corporate_governance/code_of_conduct/TEVA_CodeOf Conduct_FINAL_111715%5B2%5D.pdf.

[99] Upsher-Smith Code of Conduct, *available at* http://www.upsher-smith.com/wp-content/uploads/USL_CodeOfConduct.pdf.

200.    In the case of Heritage, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the AG's Complaint and/or the filing of the criminal Informations against Glazer and Malek.

201.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Propranolol.

202.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Propranolol.   The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Propranolol they purchased.   Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Propranolol.   Defendants' false statements and conduct concerning the prices of generic Propranolol were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Propranolol at prices established by a free and fair market.

### 1.    Active Concealment of the Conspiracy

203.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.   Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

204.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes.  Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts.  The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Propranolol.

205.    As explained in the State AG complaint, the nature of the generic drug industry— which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct.  The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[100]

206.    The Defendants also gave pretextual reasons for price increases.  For example:

> Mylan's parent company, Mylan N.V., stated in documents filed with the SEC in 2015 that "[t]he pharmaceutical industry is highly competitive" and that it "face[s] vigorous competition from other pharmaceutical manufacturers that threatens the commercial acceptance and pricing of our products."[101]
>
> Teva stated in a Q4 2015 earnings call on February 11, 2016: "There is a lot of competition in the U.S., there is no question about it. As you well know, there is [sic] over 200 generic competitors in the U.S. market and the competition is fierce."

---

[100] State AG Complaint ¶ 13.

[101] Mylan, SEC Form 10-Q at 76 (May 8, 2015), *available at* http://investor.mylan.com/secfiling.cfm?filingID=1623613-15-9&CIK=1623613.

207.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Propranolol to inflated, supracompetitive levels.

### 2.    Plaintiffs Exercised Reasonable Diligence

208.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

209.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

210.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Periods.

211.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

### XI.    CONTINUING VIOLATIONS

212.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accumulating harm within the applicable statutes of limitations.  Thus, Plaintiffs and the members of the Damages Classes can recover for damages that they suffered during any applicable limitations period.

## XII.   DEFENDANTS' ANTITRUST VIOLATIONS

213.   During the Class Periods, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Propranolol sold in the United States.

214.   In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Propranolol sold in the United States.  These activities included the following:

(a)   Defendants participated in meetings and/or conversations regarding the price of generic Propranolol in the United States;

(b)   Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Propranolol sold in the United States;

(c)   Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Propranolol; and

(d)   Defendants issued price announcements and price quotations in accordance with their agreements.

215.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

216.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Propranolol at inflated and supracompetitive prices.

217.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

218.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Propranolol than they would have paid in a competitive market.

219.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below.  Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs.  Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Classes.  The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Propranolol.

220.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for generic Propranolol has been artificially restrained;

(b)    prices for generic Propranolol sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)      end-payer purchasers of generic Propranolol sold by Defendants have

been deprived of the benefit of free and open competition in the market for generic Propranolol.

## XIII.   CLASS ACTION ALLEGATIONS

221.   Plaintiffs bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive

relief on behalf of the following two classes (the "Nationwide Classes"):

> **Capsules Nationwide Class:**   All persons and entities in the
> United States and its territories who indirectly purchased, paid
> and/or provided reimbursement for some or all of the purchase
> price for Defendants' generic Propranolol capsules, other than for
> resale, from March 2013 through the present.
>
> This class excludes: (a) Defendants, their officers, directors,
> management, employees, subsidiaries, and affiliates; (b) all federal
> and state governmental entities except for cities, towns,
> municipalities, or counties with self-funded prescription drug
> plans; (c) all persons or entities who purchased Defendants'
> generic Propranolol products for purposes of resale or directly
> from Defendants; (d) fully insured health plans (*i.e.*, health plans
> that purchased insurance covering 100% of their reimbursement
> obligation to members); (e) any "flat co-pay" consumers whose
> purchases of Defendants' generic Propranolol products were paid
> in part by a third party payer and whose co-payment was the same
> regardless of the retail purchase price; (f) pharmacy benefit
> managers; and (g) any judges or justices involved in this action and
> any members of their immediate families.
>
> **Tablets Nationwide Class:**   All persons and entities in the United
> States and its territories who indirectly purchased, paid and/or
> provided reimbursement for some or all of the purchase price for
> Defendants' generic Propranolol tablets, other than for resale, from
> December 2014 through the present.
>
> This class excludes: (a) Defendants, their officers, directors,
> management, employees, subsidiaries, and affiliates; (b) all federal
> and state governmental entities except for cities, towns,
> municipalities, or counties with self-funded prescription drug
> plans; (c) all persons or entities who purchased Defendants'
> generic Propranolol products for purposes of resale or directly
> from Defendants; (d) fully insured health plans (*i.e.*, health plans

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Propranolol products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

222.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[102] on behalf of the following two classes (the "Damages Classes"):

**Capsules Damages Class:**  All persons and entities in the End-Payer Damages Jurisdictions who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Propranolol capsules, other than for resale, from March 2013 through the present.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Propranolol products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Propranolol products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

**Tablets Damages Class:**  All persons and entities in the End-Payer Damages Jurisdictions who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for

_____

[102] The "End-Payer Damages Jurisdictions" consist of: all States (except Indiana and Ohio), as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

-94-
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' generic Propranolol tablets, other than for resale, from December 2014 through the present.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Propranolol products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Propranolol products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

223.   The Nationwide Classes and the Damages Classes are referred to herein as the "Classes."

224.   While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

225.   Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members the Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Propranolol and/or engaged in market allocation for generic Propranolol sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic Propranolol sold in the United States during the Class Periods;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Propranolol, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Classes; and

(k)     The appropriate class-wide measure of damages for the Damages Classes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

226.   Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Propranolol purchased indirectly from Defendants and/or their co-conspirators.  Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

227.   Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

228.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

229.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

230.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

# XIV.   CAUSES OF ACTION

## FIRST COUNT

### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Classes)

231.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

232.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

233.    During the Class Periods, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Propranolol, thereby creating anticompetitive effects.

234.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Propranolol.

235.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Classes who purchased generic Propranolol have been harmed by being forced to pay inflated, supracompetitive prices for generic Propranolol.

236.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

237.    Defendants' conspiracy had the following effects, among others:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)     Price competition in the market for generic Propranolol has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for generic Propranolol provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Nationwide Classes who purchased generic Propranolol indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

238.    Plaintiffs and members of the Nationwide Classes have been injured and will continue to be injured in their business and property by paying more for generic Propranolol purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

239.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

240.    Plaintiffs and members of the Nationwide Classes are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## SECOND COUNT

### Violation of State Antitrust Statutes[103]
### (on behalf of Plaintiffs and the Damages Class)

241.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

242.    During the Class Periods, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Propranolol in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

243.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Propranolol and to allocate customers for generic Propranolol in the United States.

244.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Propranolol at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Propranolol provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

---

[103] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

245.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Propranolol.

246.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

247.    [INTENTIONALLY LEFT BLANK]

**Arizona**

248.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq.* Defendants'' combination and conspiracy had the following effects: (1) price competition for generic Propranolol was restrained, suppressed, and eliminated throughout Arizona; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants'' illegal conduct substantially affected Arizona commerce. Defendants'' violations of Arizona law were flagrant. As a direct and proximate result of Defendants'' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**California**

249.   Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq.* During the Class Periods, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Propranolol at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Propranolol. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Propranolol. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Propranolol has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Propranolol provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Propranolol indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Propranolol than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Periods,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

### Connecticut

249(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Propranolol was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-35, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

### District of Columbia

250. Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq.* Defendants' combination and conspiracy had the following effects: (1) generic Propranolol price competition was

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Propranolol in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Propranolol in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Propranolol, including in the District of Columbia. During the Class Periods, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

**Hawaii**

251.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq.*

**Illinois**

252.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq.*

**Kansas**

254.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq.* Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Propranolol, increasing the prices of generic Propranolol, preventing competition in the sale of generic Propranolol, or binding themselves not to sell generic Propranolol, in a manner that established the price of generic Propranolol and precluded free and unrestricted competition among themselves in the sale of generic Propranolol, in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

**Maine**

255.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq.*

**Maryland**

255(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

**Michigan**

256. Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Propranolol prices were raised,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq.*

**Minnesota**

257. Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq.*

**Mississippi**

258. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq.* Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nebraska**

259.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq.*

**Nevada**

260.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq.*

**New Hampshire**

261.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Mexico**

262.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

**New York**

263.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

supracompetitive, artificially inflated prices for generic Propranolol that were higher than they would have been absent Defendants' illegal acts. During the Class Periods, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq.* The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq.*

**North Carolina**

264.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Gen. Stat. § 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

**North Dakota**

265.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

**Oregon**

266.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq.*

**Rhode Island**

267. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq.* Accordingly,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq.*

**South Dakota**

268.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.*

**Tennessee**

269.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

**Utah**

270.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

**Vermont**

271.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

**West Virginia**

272.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout West

Virginia; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq.*

**Wisconsin**

273. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq.* Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq.*

**As to All Jurisdictions Above**

274. Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Propranolol than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

275. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

276. Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## THIRD COUNT

### Violation of State Consumer Protection Statutes[104]
### (on behalf of Plaintiffs and the Damages Class)

277.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

278.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

279.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.*   Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Propranolol were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.   The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.   Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class

---

[104] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### Arkansas

280. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.* Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Propranolol were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Arkansas commerce

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and consumers.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**California**

281.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*   During the Class Periods, Defendants manufactured, marketed, sold, or distributed generic Propranolol in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.  This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.  Defendants' conduct as alleged herein violated § 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices,

and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Propranolol in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.  Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices.  During the Class Periods, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.  The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Propranolol.  Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.  The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code.  As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Colorado**

282.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.*  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury.  Defendants took efforts to conceal their agreements from Plaintiffs.  Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Colorado commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

283.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

levels, the prices at which generic Propranolol were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair.   Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol.  During the Class Periods, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**District of Columbia**

284.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Propranolol were sold, distributed or obtained in the District of Columbia.  During the Class Periods, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price.  Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Propranolol because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges.  Defendants' conduct with regard to sales of generic Propranolol, including their illegal conspiracy to secretly fix the price of generic Propranolol at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class.  The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic Propranolol.  Defendants' unlawful conduct had the following effects: (1) generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Propranolol price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol.  As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

285.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol.  During the Class Periods, Defendants' illegal conduct substantially affected Florida commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

286.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.* and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol.  Defendants misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol.  During the Class Periods, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury.  That loss was

caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

287.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol.  During the Class Periods, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Massachusetts**

288. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq.* Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Propranolol were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.   The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol.   During the Class Periods, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

willful, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

289.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Michigan.  Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol.  Defendants misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception,

including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

290. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly,

Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

291.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*   Plaintiffs and members of the Damages Class purchased generic Propranolol for personal or family purposes.   Defendants engaged in the conduct described herein in connection with the sale of generic Propranolol in trade or commerce in a market that includes Missouri.   Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol.   The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol they purchased.   Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Propranolol by making public statements that were not in accord with the facts.   Defendants' statements and conduct concerning the price of generic Propranolol were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing generic Propranolol at prices established by a free and fair market.   Defendants' unlawful conduct had the following

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

**Montana**

292.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3)

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants marketed, sold, or distributed generic Propranolol in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, et. seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

293.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol.  During the Class Periods, Defendants marketed, sold, or distributed generic Propranolol in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

294.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Nevada.  Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol.  Defendants misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

as described herein.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

295.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants marketed, sold, or distributed generic Propranolol in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Jersey**

296.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in New Jersey.  Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol.  Defendants misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair.  Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Mexico**

297.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Propranolol were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Propranolol as set forth in New Mexico Stat. § 57-12-2E.  Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price.  Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Propranolol because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges.  Defendants' conduct with regard to sales of generic Propranolol, including their illegal conspiracy to secretly fix the price of generic Propranolol at supracompetitive levels and overcharge consumers, was substantively

unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class.   The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Propranolol. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol.   During the Class Periods, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New York**

298.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed or obtained in New York and took efforts to conceal their agreements from

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class.  Defendants and their co-conspirators made public statements about the prices of generic Propranolol that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Propranolol; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Propranolol were misled to believe that they were paying a fair price for generic Propranolol or the price increases for generic Propranolol were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Propranolol would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Propranolol would have a broad impact, causing consumer class members who indirectly purchased generic Propranolol to be injured by paying more for generic Propranolol than they would have paid in the absence of Defendants' unlawful trade acts and practices.  The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner.  Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants marketed, sold, or distributed generic Propranolol in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Periods, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Propranolol in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

299.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Propranolol created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge

the existence of the conspiracy to outsiders.   The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.   Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol.   During the Class Periods, Defendants marketed, sold, or distributed generic Propranolol in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.   During the Class Periods, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Propranolol in North Carolina.   Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

300.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Practices Statute, N.D. Century Code § 51-15-01, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol.  Defendants misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

301.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*  Members of the Damages Class purchased generic Propranolol for personal, family, or household purposes.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol.  Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence.  Defendants misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market.  Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol they purchased.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### South Carolina

302.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.*  Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

303.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. Defendants' illegal conduct substantially affected South Dakota commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use

or employment of unconscionable and deceptive commercial practices as set forth above. That

loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants'

deception, including their affirmative misrepresentations and omissions concerning the price of

generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to

believe that they were purchasing generic Propranolol at prices set by a free and fair market.

Defendants' affirmative misrepresentations and omissions constitute information important to

Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol

they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and

members of the Damages Class seek all relief available under that statute.

**Utah**

304.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-

11-1, *et seq.* Members of the Damages Class purchased generic Propranolol for personal, family,

or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or

commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at

artificial and non-competitive levels, the prices at which generic Propranolol were sold,

distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to

Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and

artificially inflated prices for generic Propranolol. Defendants owed a duty to disclose such facts,

and considering the relative lack of sophistication of the average, non-business purchaser,

Defendants breached that duty by their silence. Defendants misrepresented to all purchasers

during the Class Periods that Defendants' generic Propranolol prices were competitive and fair.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

305. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. During the Class Periods, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Vt. Stat. § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Virginia**

306.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq.* Members of the Damages Class purchased generic Propranolol to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Virginia; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**West Virginia**

307.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants affirmatively misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Wisconsin**

308.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### U.S. Virgin Islands

309.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq.* Defendants agreed to, and did in fact,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants affirmatively misrepresented to all purchasers during the Class Periods that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Propranolol. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol they purchased. Defendants

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

### Unjust Enrichment[105]
### (on behalf of Plaintiffs and the Damages Class)

310.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

311.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

312.    Defendants have unlawfully benefited from their sales of Propranolol because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol at prices that were more than they would have been but for Defendants' unlawful actions.

313.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

314.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

315.    Defendants have been enriched by revenue resulting from unlawful overcharges for Propranolol while Plaintiffs and the Damages Class have been impoverished by the

---

[105] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

overcharges they paid for Propranolol imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

316.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

317.    Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

318.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Propranolol.

319.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Propranolol are ascertainable by review of sales records.

320.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Propranolol.

321.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Propranolol, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

322.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Propranolol is a direct and proximate result of Defendants' unlawful practices.

323.     The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Periods, inuring to the benefit of Defendants.

324.     It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico and the U.S. Virgin Islands, for Defendants to be permitted to retain any of the overcharges for Propranolol derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

325.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

326.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Propranolol.

327.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Propranolol by Plaintiffs and the Damages Class.

328.     Plaintiffs and the Damages Class have no adequate remedy at law.

329.     By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Propranolol and forcing them to pay higher prices for Propranolol, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

330.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Propranolol.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

331.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Alaska at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Arizona**

332.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Propranolol. Plaintiffs and the Damages Class have been impoverished by the overcharges for Propranolol resulting from Defendants' unlawful conduct.    Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Arkansas**

333.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**California**

334.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in California at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

### Colorado

335.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants have benefitted at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Connecticut

336.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Connecticut at prices that were more than they would have been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants have paid no consideration to any other person in exchange for this benefit.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Delaware**

337.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Delaware at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Propranolol.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Propranolol resulting from Defendants' unlawful conduct.   Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**District of Columbia**

338.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

339.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Florida at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

340.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

341.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Idaho**

342.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

343.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Illinois at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

344.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Propranolol, which revenue resulted from anticompetitive prices paid by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

345. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Kansas at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kentucky**

346. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Kentucky at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Louisiana**

347.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Louisiana at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Propranolol.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Propranolol resulting from Defendants' unlawful conduct.   Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

**Maine**

348.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Maine at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

349.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Maryland at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Massachusetts**

350.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Massachusetts at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Michigan**

351.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Michigan at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

352.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Minnesota at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Mississippi**

353.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Propranolol, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

354.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Missouri at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

### Montana

355.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Montana at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Nebraska

356.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Nebraska at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nevada**

357.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Nevada at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Propranolol.   Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

358.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in New Hampshire at prices that were more than they would have been but for Defendants' actions.   Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.   Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

359.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in New Jersey at prices that were more than they would have been but for Defendants' actions.   Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.   The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Propranolol. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### New Mexico

360. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Propranolol. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

### New York

361. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Propranolol, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**North Carolina**

362.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in North Carolina at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.  Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

363.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Propranolol.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Propranolol resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.  Under the circumstances,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Oklahoma**

364.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

365.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Oregon at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Pennsylvania**

366.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Puerto Rico**

367.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Puerto Rico at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Propranolol.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Propranolol resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Rhode Island**

368.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Rhode Island at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### South Carolina

369.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in South Carolina at prices that were more than they would have been but for Defendants' actions.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### South Dakota

370.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Tennessee**

371.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Tennessee at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Propranolol.  It would be futile for Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Propranolol directly from any Defendant.

**Texas**

372.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Texas at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  The circumstances under which Defendants have retained the benefits bestowed upon them by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Propranolol.  Plaintiffs and the Damages Class have no remedy at law.

**Utah**

373.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Utah at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Vermont**

374.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

375.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Virginia at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit

bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the

Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they

constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair

actions to inflate the prices of Propranolol.  Defendants have paid no consideration to any other

person for any of the benefits they have received from Plaintiffs and the Damages Class.

### Washington

376.    Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Propranolol in Washington at prices that were more than they would have

been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or

appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the

circumstances, it would be inequitable for Defendants to retain such benefits without

compensating Plaintiffs and the Damages Class.

### West Virginia

377.    Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Propranolol in West Virginia at prices that were more than they would have

been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Wisconsin

378.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Wyoming

379.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in Wyoming at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**U.S. Virgin Islands**

380.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Propranolol in the United States Virgin Islands at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Propranolol, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

381.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

382.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

383.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

384.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

385.    Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

386.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

387.    Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

388.    Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

389.    Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

### XVI.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

April 1, 2019                                          Respectfully submitted,

Roberta D. Liebenberg, Esquire
Fine, Kaplan and Black, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
(215) 567-6565
rliebenberg@finekaplan.com

**Lead Counsel for the End-Payer Plaintiffs**

Gregory S. Asciolla, Esquire                     Michael M. Buchman, Esquire
Labaton Sucharow LLP                             Motley Rice LLC
140 Broadway                                     600 Third Avenue, Suite 2101
New York, NY  10005                              New York, NY  10016
(212) 907-0700                                   (212) 577-0040
gasciolla@labaton.com                            mbuchman@motleyrice.com

Elizabeth J. Cabraser, Esquire                   James R. Dugan, II, Esquire
Lieff Cabraser Heimann & Bernstein LLP           The Dugan Law Firm, APLC
275 Battery Street, 29th Floor                   365 Canal Street, Suite 1000
San Francisco, CA  94111-3339                    New Orleans, LA 70130
(415) 956-1000                                   (504) 648-0180
ecabraser@lchb.com                               jdugan@dugan-lawfirm.com

Jayne A. Goldstein, Esquire                      Mindee J. Reuben, Esquire
Shepherd Finkelman Miller & Shah, LLP            Lite DePalma Greenberg, LLC
1625 N. Commerce Parkway, Suite 320              1835 Market Street, 27th Floor
Fort Lauderdale, FL 33326                         Philadelphia, PA  19103
(886) 849-7545                                   (267) 314-7980
jgoldstein@sfmslaw.com                           mreuben@litedepalma.com

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Joseph R. Saveri, Esquire
Joseph Saveri Law Firm, Inc.
555 Montgomery Street, Suite 1210
San Francisco, CA 94111
(415) 500-6800
jsaveri@saverilawfirm.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
(612) 339-6900
hmsilton@locklaw.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000
azapala@cpmlegal.com

Dena C. Sharp, Esquire
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
(415) 633-1908
bsweeney@hausfeld.com

### End-Payer Plaintiffs' Steering Committee

Audrey A. Browne, Esquire
American Federation of State, County and
Municipal Employees District Council 37
Health & Security Plan
125 Barclay Street, Room 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net

**Attorneys for Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan**

Marc H. Edelson, Esquire
Edelson & Associates, LLC
3 Terry Drive, Suite 205
Newtown, PA 18940
(215) 867-2399
medelson@edelson-law.com

Peter Safirstein, Esquire
SAFIRSTEIN METCALF LLP
1250 Broadway, 27th Floor
New York, NY 10001
(212) 201-2845
psafirstein@safirsteinmetcalf.com

**Additional End-Payer Plaintiffs' Counsel**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2019, the foregoing Consolidated Amended End-Payer Class Action Complaint was filed with the Clerk of Court who will electronically enter this filing on the docket.  Thereafter, via ECF notifications, the filing will be served on all interested parties registered for electronic filing and be available for viewing and downloading from the Court's ECF system.

Roberta D. Liebenberg